AO 106 (Rev. 04/10)  Application for a Search Warrant

FAUSA Jessica Kim

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

RICHARD W. NAGEL
CLERK OF COURT

2018 SEP 26  PM 2: 36

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| In the Matter of the Search of | |
|---|---|
| (Briefly describe the property to be searched or identify the person by name and address) | ) ) ) |
| Information associated with Facebook user ID #1077127816 (in the name of Andrew K Mitchell) that is stored at premises controlled by Facebook Inc. | ) ) ) ) |

Case No.  2:18 mj 735

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (identify the person or describe the property to be searched and give its location):

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed (identify the person or describe the property to be seized):

See Attachment B and/or attached Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 242 | Deprivation of rights under color of law |
| 18 U.S.C. 1951 | Hobbs Act extortion |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Robert D. Bogner, Task Force Officer, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date:  9-26-18

_____
Judge's signature

City and state:  Columbus, Ohio

Hon. Elizabeth Preston Deavers, U.S. Magistrate Judge
Printed name and title

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF:

Information associated with

Facebook user ID #1077127816
(in the name of Andrew K Mitchell)

that is stored at premises controlled by
Facebook Inc.

Case No. **2:18 mj 7 3 5**

**UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Robert D. Bogner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.     I am an Inspector with the Ohio Auditor of State (AOS), where I have worked since February 2015.  As an AOS Inspector, I am responsible for conducting criminal investigations involving theft, theft in office, public corruption, and other violations of law. Since February 2017, I have been deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI), Columbus Resident Agency for the Southern District of Ohio, Eastern Division.  I am currently assigned to the Public Corruption Squad.  As such, I am an

"investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      Prior to working as an AOS Inspector, I was a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) for 28 years. During that time, I investigated violations of the Internal Revenue laws and related offenses and was involved in numerous investigations involving violations of the United States Code. I have provided financial investigative expertise and assistance to various federal and local agencies, including the FBI, Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Columbus Division of Police Narcotics Bureau.

4.      During my tenure as a Task Force Officer with the FBI, I have been assigned to work on various types of investigations, including public corruption, financial crimes, violent crimes, narcotics offenses, and money laundering. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

5.      I, along with other agents and officers from the FBI, the Columbus Division of Police (CPD), the Ohio Bureau of Criminal Investigation (BCI), and the Ohio Auditor of State (AOS), have been investigating corruption in the Columbus Division of Police Department's Vice Unit involving CPD Vice Unit Detective Andrew K. Mitchell. Over the course of this investigation, I have become familiar with the organization and structure of the CPD Vice Unit, as well as the nature and scope of the CPD Vice Unit's duties.

2

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 242 (deprivation of rights under color of law) and 18 U.S.C. § 1951 (Hobbs Act extortion) have been committed by Andrew K. MITCHELL.  There is also probable cause to search the information described in Attachment A for evidence of these crimes (and contraband or fruits of these crimes), as described in Attachment B.

## **PROBABLE CAUSE**

8.     Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses; (ii) investigative reports and arrest records; (iii) federal and state law enforcement officers; (iv) public database searches; and (v) the ongoing investigation of the CPD Vice Unit in this district, I am aware of the following facts.

### **Background of Target**

9.     Andrew K. MITCHELL has been a CPD officer since 1987.  During his tenure as a police officer with CPD, MITCHELL has held a number of investigative assignments, including serving as a detective in the Homicide Section (from March 2012 to May 2015) and the Vice Unit.  MITCHELL is currently assigned as a detective in the Vice Unit, and has been in this assignment since March 12, 2017.  During at least 2002, 2004, and 2005, MITCHELL was sworn in as a Deputy Sheriff with the Franklin County Sheriff's Office.

10.     As secondary employment, MITCHELL owns and manages numerous rental

3

properties, the duties of which include maintenance and bookkeeping. Since the 1990s, Mitchell has owned at least 40 properties in the Central Ohio area, which he operates as apartments for rent.

### Operational Background of CPD Vice Unit

11.     The CPD Vice Unit is charged with enforcing, among other things, prostitution-related offenses. Many of these offenses are misdemeanor violations under the Ohio Revised Code. Because of the nature of the offenses, and the types of crimes being investigated, CPD Vice Unit detectives are given a broad amount of latitude while performing their duties, including working alone in their respective on-duty vehicles.

12.     Your Affiant is aware of the following CPD procedure for prostitution-related offenses: Once a CPD Vice Unit detective decides to take an enforcement action (*e.g.*, picking up a suspected prostitute for potential arrest), the CPD Vice Unit detective is supposed to radio for his/her partner or another backup officer, as well as begin audio recording within the vehicle. If the CPD Vice Unit detective determines that the elements are met for the offense of prostitution, the policy is to detain and transport the subject to a common location with other Vice Unit officers for the processing of paperwork. This location may be a parking lot or a fixed structure. If there are no outstanding warrants for the subject's arrest, the subject is given a summons and then released. If there are outstanding warrants for the subject's arrest, arrangements are made for the subject to be transported to a local correctional facility.

### Criminal Investigation Involving Witness 1

13.     On or about September 6, 2018, investigators received information from individuals overseeing the Franklin County Municipal Court's Changing Actions to Change

4

Habits (CATCH) program indicating that serious crimes were being committed by a CPD officer.

14.     On or about September 7, 2018, investigators interviewed Witness 1, a CATCH court participant who was willing to speak to law enforcement to report a sexual assault. Witness 1 disclosed she had been a prostitute in the past and was currently in the CATCH court program.

15.     While working as a prostitute in the late summer to early fall of 2017, Witness 1 voluntarily entered a vehicle with the intent to engage in a sex act in exchange for money. Witness 1 described the vehicle as a Jeep-like, medium-sized SUV, similar to a Lincoln Navigator, with leather interior (color unknown) and a grab handle in the back. After Witness 1 and the man operating the vehicle negotiated a price for sex, the man pulled out a law enforcement badge, identified himself as a Vice Officer, asked if she was a cop, and then asked if she had active warrants for her arrest. Witness 1 recalled that the man asked for her name, date of birth, and then ran her for active warrants using one of his two cell phones. Witness 1 also recalled that the man was wearing black or blue basketball shorts with a gray or white line down the sides and a matching shirt. The man, who was light-skinned African-American, drove to a small park off of Briggs Road in Columbus (believed by your Affiant to be Lindbergh Park) and told Witness 1 that if she did not want to go to jail, she was going to have sex with him. Witness 1 agreed to have sex with the man because she did not want to go to jail, knowing that she had active warrants and was in possession of needles and a crack pipe.

16.     Witness 1 then got into the back seat of the vehicle, followed by the man. When told to reach behind her, Witness 1 complied, thinking that the man wanted her to grab his penis. The man, however, placed one handcuff on her wrist and then fastened the other handcuff to the

grab handle over the passenger side rear door, at which point the man pulled down Witness 1's pants and began having vaginal sex with her. During vaginal sex, the man bit Witness 1's back, pulled her hair really hard, and was generally very rough with her. When he was finished, the man drove Witness 1 to a drug house to the area of Wayne Avenue and Mound Street where he allowed her to exit the vehicle. Initially, Witness 1 did not think the man who sexually assaulted her was actually a police officer. After the assault, however, Witness 1 spoke to other prostitutes in the drug house who warned her about the "light-skinned black man."

17.     A search of the Ohio Law Enforcement Gateway (OHLEG) database reveals that a black 2015 Lincoln Navigator, VIN #5LMJJ2JT1FEJ01610, Ohio license plate number GLX6189, is registered to MITCHELL's wife, Tanya Mclymont Mitchell, at 6249 Howard Road Sunbury, Ohio 43074. This vehicle has significant similarities to the vehicle described by Witness 1 used in the late summer/early fall of 2017 sexual assault.

18.     After the assault, Witness 1 was on the street working as a prostitute when she had an interaction with another prostitute, Witness 2  As a car drove past them, Witness 2 pointed to the car and warned Witness 1 not to enter the vehicle because the driver was a CPD Vice Unit Detective named "Andy Mitchell." Witness 2 told Witness 1 that "Detective Mitchell" might take you to jail or make you have sex with him instead of being arrested. Witness 2 said she knew the officer's name because he had written her a summons for Soliciting. (Your Affiant is aware that CPD records and the Franklin County Correctional Center management system indicate that MITCHELL issued a summons to Witness 2 on a specific date, which is documented by a numbered CPD report.)

19.     In or around June or July of 2018, Witness 1 was working as a prostitute when she voluntarily entered a vehicle with the intent of exchanging a sex act for money. Upon

6

entering the vehicle, Witness 1 realized the driver was the same man that sexually assaulted her in the fall of 2017 and the person that Witness 2 had identified as CPD Vice Unit Detective Andrew MITCHELL. Witness 1 told investigators that MITCHELL was not driving the same vehicle as the day of the first assault. She described the vehicle as a black, 4-door, "nicer car" with a gray-black leather interior, a nice stereo system, and slightly tinted windows.

20.     MITCHELL asked Witness 1 if she had any active warrants, to which she responded "yes." He also asked her if she had any drugs, to which she responded "yes." When Witness 1 tried to open the door to jump out, MITCHELL grabbed her hair to prevent her from leaving the vehicle and said he was taking her to jail. Witness 1 knew the arrest procedure and knew something was wrong because he did not call for a police officer.

21.     MITCHELL drove them to a park near Interstate 71 and Greenlawn Avenue (believed by your Affiant to be Berliner Park), where he parked and asked Witness 1 if she was going to make this easy or hard. MITCHELL pulled Witness 1's hair, turned her around in the front passenger seat, placed a handcuff on her wrist, fastened the other handcuff to the grab handle above the passenger side door, then forced his penis into her anus "hard." During the assault, MITCHELL turned up the car stereo and placed his hand over Witness 1's mouth when she began screaming.

22.     Witness 1 told investigators that as MITCHELL was penetrating her anus, he pushed her chest against the back of the passenger side front seat and forced her against the headrest, while placing his other hand on the headrest to brace himself, such that she could see MITCHELL's hand. Witness 1 noted that MITCHELL had swollen or rather large knuckles. Witness 1 also recalled that MITCHELL had an impression or indentation on his finger as though he had removed a ring that was on his finger for a period of time. She also remembered a

7

black bag that was on the floor behind the driver's seat, which MITCHELL began to reach into prior to the sexual assault. She further recalled the seat material not being fabric but, rather, leather or something smooth, as she remembered "sticking" to them. She recalled seeing two cell phones that were sandwiched together in the center console cup holder of the vehicle. (Your Affiant knows that MITCHELL was issued a CPD cell phone and also had a personal cell phone (number 614-679-0788) during this timeframe.)

23.     When MITCHELL was finished, he unlocked the handcuffs using a pen-style handcuff key. Witness 1 told investigators that her pants were off while the attack occurred, and when MITCHELL had finished, he pulled up his pants and shoved her out of the vehicle, leaving her in the public park without pants. Witness 1 stated that MITCHELL took her pants with him. She described her pants as black leggings made of a stretchy material with a design on the legs. Witness 1 also remembered that MITCHELL was wearing a T-shirt and what she described as pants or shorts with pockets on the side (i.e., cargo pants/shorts) and smelled of expensive cologne. She recalled that MITCHELL was wearing a baseball cap that was black and white in color and had a bird "like an eagle" or something similar.

24.     On or about September 11, 2018, Witness 1 identified CPD Officer Andrew MITCHELL from a photo array as the person who sexually assaulted her on two occasions as described above.

25.     CPD payroll records reveal that MITCHELL's duty hours were 9:00am – 5:00pm with Saturday and Sunday as his days off. Witness 1 indicated that the June/July 2018 sexual assault occurred near dusk.

26.     A search of the Ohio Law Enforcement Gateway (OHLEG) database further reveals that MITCHELL owns a dark gray 2013 Cadillac XTS, VIN #2G61P5S32D9107621,

Ohio license plate number EPJ9719 (purchased on May 18, 2015), registered to him at 6249 Howard Road Sunbury, Ohio 43074. This vehicle has significant similarities (i.e., 4-door, darker, "nicer car" with slightly tinted windows) to the vehicle described by Witness 1 used in the June/July 2018 sexual assault.

27. On or about September 24, 2018, Witness 1 was shown an image of a 2013 Cadillac XTS by investigators. Witness 1 affirmed that the image depicted the vehicle that she had been in when she was sexually assaulted by MITCHELL in June/July 2018. Witness 1 became visibly upset and began to cry after viewing the image of the vehicle.

## Criminal Investigation Involving Witness 3

28. Previously, in the summer of 2018, the CPD Vice Unit and the New Salem Baptist Church Anti-Human Trafficking Ministry were collaborating on a project to address street prostitution in the North Linden area of Columbus, Ohio. During this project, on or about July 18, 2018, Witness 3 was arrested by another CPD Vice Unit detective and charged with soliciting. At the time of the arrest, Witness 3 provided the arresting officer with a false identity of her cousin, "Witness 6" Subsequently, the arresting officer processed an arrest information report and a misdemeanor summons utilizing the false information provided by Witness 3, which ordered "Witness 6" in Franklin County Municipal Court on July 27, 2018 at 9:00am.

29. While Witness 3's arrest was being processed, a church volunteer witnessed MITCHELL siting in a chair and talking with Witness 3 Once Witness 3 was free to leave, the church volunteer informed Witness 3 of the social services New Salem Baptist Church Anti-Human Trafficking Ministry offered to women charged with prostitution offenses. During the conversation, the church volunteer asked if "Witness 6" was her real name and she responded no, and revealed her real name. Witness 3 told the church volunteer that she had only been out on

the street a couple of years and that the African-American who was sitting next to her inside the church was one of her first tricks. According to the church volunteer, MITCHELL was the only African-American officer in the room.

30.     On or about August 15, 2018, the CPD Vice Unit conducted another street prostitution enforcement operation in collaboration with the New Salem Baptist Church. During the operation, Witness 3 was again arrested and charged with loitering to engage in solicitation by another CPD Vice Unit detective. The arresting officer brought Witness 3 to the New Salem Baptist Church for arrest processing. During the processing, Witness 3 told arresting officers that she had been having a sexual relationship with a CPD officer named Andy Mitchell.

31.     As a result of the allegation described above, Witness 3 was interviewed by CPD internal affairs sergeants and supervisory management. Approximately 4–5 years ago, Witness 3 met MITCHELL through her cousin, Witness 6, who rented an apartment from MITCHELL at 1994 or 1995 Denune Avenue, and later on Oakland Park. At the time, Witness 3 was in need of an apartment and began renting 1993 Denune from MITCHELL for approximately 6–7 months. (Your Affiant knows that MITCHELL has owned 1975 – 1999 Denune Avenue since May 16, 2000, and 1934 – 1940 Oakland Park Avenue from May 4, 1999 until it was sold on April 4, 2017.)

32.     Witness 3 told investigators that she began having sex for money when she began abusing prescription pills. MITCHELL would take Witness 3 to his apartment on Oakland Park that he called his "home away from home," where he would have vaginal sex with her, without a condom, and pay her $40.00 each time. After sex, MITCHELL would take Witness 3 to her apartment or a drug house to purchase pills. MITCHELL knew that Witness 3 used drugs, but she never did drugs in front of him. When Witness 3 was in physical need of pills to feed her

drug habit, MITCHELL would drive her to a dope house to get pills before having sex. When MITCHELL picked up Witness 3, he would always be driving his pickup truck or newer black Cadillac.

33.     Witness 3 further told investigators that she knows that MITCHELL has rented properties to at least two other prostitutes (Witness 4 and Witness 5), who were having sex with MITCHELL for money.

34.     Witness 3 also told investigators that, while she was in custody at the Franklin County Correctional Center, a fellow inmate, Witness 5, approached her and stated that MITCHELL had called her and said that Witness 3 was "snitching" on him. As described above, the fellow inmate, Witness 5, was also a tenant of one of MITCHELL's properties.

35.     Witness 3 further told investigators that MITCHELL has also had sex with Witness 6 for money and believed that Witness 6 was still having contact with MITCHELL.

### Target's Rental Properties

36.     A search of the Franklin County Auditor and Recorders Office websites revealed that MITCHELL has purchased and/or sold over 40 rental properties since the 1990s. Records show that MITCHELL currently owns the following properties:

| | |
|---|---|
| 1260 Parsons Avenue | 1712-1716 Reinhard Avenue |
| 1975-1999 Denune Avenue | 2097 Paul Drive |
| 1179 East 20th Avenue | 1310 Miller Avenue |
| 500 Capital View Drive | 1311 Miller Avenue |
| 1854 Joan Place | 1315 Miller Avenue |
| 1680-1686 Reinhard Avenue | 1319-1321 Miller Avenue |
| 1692-1698 Reinhard Avenue | 1397 Miller Avenue |
| 1702-1708 Reinhard Avenue | |

Records further show that MITCHELL owns three additional parcels on Miller Avenue.

37.     The Franklin County Auditor's website shows the rental contact information as

11

being "Andrew K. Mitchell, 6429 Howard Road, Sunbury, Ohio 43074," MITCHELL's primary residence.

### Target's Secondary Employment

38.     On or about January 31, 2017, MITCHELL submitted a secondary employment request with CPD for approval to work for Keller Williams. MITCHELL described himself as a licensed real estate agent in the State of Ohio showing listed properties.

39.     On or about January 3, 2018, MITCHELL submitted a letter to the CPD Chief of Police requesting approval for secondary employment. In the letter, MITCHELL stated he owned and operated numerous rental properties in the Columbus area and that his duties included bookkeeping, maintenance, and general property management.

40.     MITCHELL subsequently submitted a secondary employment/off-duty request, dated January 16, 2018, that described himself as "self-employed" with an employer address of "6429 Howard Road, Sunbury, Ohio 43074," MITCHELL's primary residence.

### Eviction Notices

41.     This investigation has identified several prostitutes who engaged in sex acts for money with MITCHELL and/or were tenants in MITCHELL's rental properties. A search of Franklin County Municipal Court records revealed the following eviction notices were filed by MITCHELL, who used an address of "6429 Howard Road, Sunbury, Ohio 43074," MITCHELL's primary residence:

| DATE | EVICTION DEFENDANT | PROPERTY ADDRESS |
|---|---|---|
| 07/01/2014 | Witness 3 | 1999 Denune Avenue, #B |
| 10/13/2016 | Witness 6 | 1938 Oakland Park Avenue, Apt. B |
| 12/22/2016 | Witness 4 | 1938 Oakland Park Avenue, Apt. D |
| 12/08/2017 | Witness 4 | 1975 Denune Avenue |

## Social Media-Related Investigation

42.    During the course of this investigation, investigators have learned of at least two women who posted on social media that they had rented properties from MITCHELL, and that he had propositioned them for sex in exchange for rent.

43.    Evidence obtained during this investigation has revealed that MITCHELL is connected with Witness 3, as well as Witness 5 and Witness 6 (discussed above), and other potential witnesses on Facebook (i.e., Facebook friends with).

44.    Based on the information described above, a preservation request was sent to Facebook regarding the account described in Attachment A on or about September 19, 2018.

## Additional Ongoing Investigation

45.    As of on or about September 25, 2018, five additional women have contacted investigators reporting information regarding alleged misconduct by MITCHELL.

## BACKGROUND INFORMATION ABOUT FACEBOOK

46.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

47.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

48. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

49. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

50. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

51.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

52.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

53.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

54.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

55. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

56. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

57. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

58. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

59. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

60. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

16

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

61.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access,

17

use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

62.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

63.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

64.     Based on the forgoing, I request that the Court issue the proposed search warrant.

65.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

66.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Robert D. Bogner
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on September 26 , 2018.

Honorable Elizabeth Preston Deavers
UNITED STATES MAGISTRATE JUDGE

Chelsey M. Vascura, U.S. Magistrate Judge

19

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the **Facebook user ID #1077127816 (in the name of Andrew K Mitchell)** that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

I.   **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

   (a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   (b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 2012 to the present;

   (c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 2012 to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

   (d)   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)      All other records and contents of communications and messages made or received by the user from January 2012 to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)      All "check ins" and other location information;

(h)      All IP logs, including all records of the IP addresses that logged into the account;

(i)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)      All information about the Facebook pages that the account is or was a "fan" of;

(k)      All past and present lists of friends created by the account;

(l)      All records of Facebook searches performed by the account from January 2012 to the present;

(m)      All information about the user's access and use of Facebook Marketplace;

(n)      The types of service utilized by the user;

(o)      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.**

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 242 (deprivation of rights under color of law) and/or 18 U.S.C. § 1951 (Hobbs Act extortion) involving Andrew K. MITCHELL since January 2012 to the present, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) Police and/or public corruption, abuse of power, obstruction of justice, extortion, sexual assault, assault;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b. such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature